## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JEFFERY RICHARDSON, *et al*.,

                              Plaintiffs,

          v.

NICHOLAS ORIOLO, *et. al*.,

                              Defendants.

Civil Action No. 16-135 (JXN) (AME)


**<u>OPINION</u>**

**<u>NEALS</u>**, District Judge

     Plaintiffs Jeffery Richardson and Colby Richardson (collectively "Plaintiffs") are state prisoners currently incarcerated at East Jersey State Prison in Rahway, New Jersey. They are proceeding *pro se* with an Amended Complaint for civil rights violations filed pursuant to 42 U.S.C. § 1983. (ECF No. 34.) Presently before the Court is a joint motion for summary judgment on behalf of Defendants Nicholas Oriolo and the State of New Jersey (collectively "Defendants"), (ECF No. 88), Plaintiffs' response (ECF No. 91), and Defendants' reply (ECF No. 95). Also before the Court is Plaintiffs' motion for summary judgment (ECF No. 89), Defendants' response (ECF No. 94), and Plaintiffs' reply (ECF No. 96.) For the reasons stated below, Defendants' motion for summary judgment (ECF No. 88) is **GRANTED** and Plaintiffs' motion for summary judgment (ECF No. 89) is **DISMISSED as moot**.

## I.   **<u>FACTUAL BACKGROUND</u>**

     This civil rights action arises from the arrest and criminal prosecution of Plaintiffs following a shooting, which resulted in the death of one individual. It is undisputed that on December 15, 2013, a shooting occurred at the Exxon Gas Station located at1 Elizabeth Avenue,

in the City of Newark at the intersections of Elizabeth and Clinton Avenues. (ECF No. 88-4, Defendants' Statement of Material Fact ("DSOMF") ¶1.) Two individuals, Naeem Williams ("Williams") and Jennifer Gilbert ("Gilbert"), were shot. (*Id.*) Williams was pronounced dead at the scene. (*Id.*) Gilbert suffered several gunshot wounds and was transported to University Hospital. (*Id.*)

Defendant Detective Nicholas Oriolo ("Det. Oriolo") was assigned to the investigation of the shooting. (*Id.* ¶ 2.) Det. Oriolo obtained video surveillance footage from a Newark Police Department city camera located at the intersection of Elizabeth and Clinton Avenues, which captured footage of the shooting. (*Id.* ¶ 3[1]; ECF No. 89-9, December 30, 2013 Continuation Report at 6.) The camera captured

> [T]wo individuals running northbound along the sidewalk area adjacent to the Exxon Gas Station property. The two individuals are running toward two other individuals who are positioned to the north of them. The two running individuals approach the two individuals to the north of them; appear to pull items from their person, and what appear to be muzzle flashes are observed before the camera pans away from that location. One of the running individuals appears to specifically approach, and target, one of the individuals to the north, and the other running individual appears to specifically approach, and target, the other individual to the north. When the camera pans back to the location of the shooting incident, two individuals can be observed laying on the ground where the shooting incident occurred. The two individuals who appeared to have shot the victims were no longer observed on the video surveillance footage.

(ECF No. 89-9 at 7.)

It is undisputed that during the investigation Det. Oriolo interviewed Jovanna Hinnant ("Hinnant"), who was a former friend of Gilbert. (DSOMF ¶ 4; ECF No. 88-8 at 3-4.) It is also

---

[1] Defendants cite to Det. Oriolo's February 19, 2014 Continuation Report regarding this footage. (*See* ECF 88-4 ¶ 3, citing Ex. D. February 19, 2014 Continuation Report.) However, that citation is incorrect, the information regarding the footage from the Newark Police Department city camera located at the intersection of Elizabeth and Clinton Avenues, which captured footage of the shooting, is found in Det. Oriolo's December 30, 2013 Continuation Report. (*See* ECF No. 89-9 at 6.) Plaintiffs have provided the December 30, 2013 Continuation Report and do not dispute this portion of it in their statement of material facts.

undisputed that Hinnant informed Det. Oriolo that Williams had previously been involved in an altercation with "two brothers." (*Id.*) Defendants submit that Det. Oriolo showed Hinnant surveillance video of "the shooting and [she] stated that she observed one of the 'two brothers' involved in the altercation with [] Williams in the video." (DSOMF ¶ 4.) Plaintiffs dispute this fact and state that Hinnant's identification of one of the brothers stemmed from video footage from nearby Luisa Grocery store at 123 Elizabeth Avenue. (ECF No. 91-1, Plaintiff's Statement of Material Facts ("PSOMF") ¶ 1.) Det. Oriolo's February 19, 2014 Continuation Report indicates that he showed Hinnant video from 123 Elizabeth Avenue, Newark, New Jersey, and she stated, "she observed one of the 'two brothers' who were involved in the altercation with Williams." (ECF No. 88-8 at 3-4.)

It is undisputed that on January 29, 2014, Det. Oriolo spoke with another witness, Kamika Irby ("Irby"), who stated that she saw Plaintiffs pull out handguns and shoot the victims. (DSOMF ¶ 5.) Irby further advised that Plaintiffs had a physical altercation with Williams prior to the shooting. (*Id.*) Det. Oriolo's February 19, 2014 Continuation Report indicated that Irby "identified the two shooters as 'D' and 'B', stating that she did not know their real names, but that she called them by the street names 'D' and 'B'." (ECF No. 88-8 at 8.) Irby estimated that she knew the individuals for approximately three to four years. (*Id.*) Following a photo array, Irby identified Plaintiffs as the shooters. (DSOMF ¶ 5.)[2]

It is undisputed that on February 3, 2014, Det. Oriolo met with and obtained a formal statement from Gilbert. (DSOMF ¶ 6.) Gilbert advised that she had been with Williams walking on Elizabeth Avenue, heard a noise like "firecrackers" and felt something hit her leg. (*Id.*) She

---

[2] Plaintiffs argue that Irby's statement has inconsistencies, which are addressed by the Court below, but they do not dispute these facts. (PSOMF ¶ 2.)

stated that the two individuals whom she had observed earlier in the day were the shooters.[3] (*Id.*) Gilbert viewed photographs of Plaintiffs and identified them as the shooters. (*Id.*)

On February 6, 2014, Det. Oriolo and a prosecutor met with Judge Peter J. Vazquez of the Essex County Superior Court. (DSOMF ¶ 7.) Judge Vazquez was presented with an Affidavit in Support of Arrest Warrants for Plaintiffs (the "Affidavit"). (*Id.*; ECF No. 88-7, Affidavit in Support of Arrest Warrants.) Following review of the Affidavit, Judge Vazquez authorized the issuance of the arrest warrant. (DSOMF ¶ 7.)

On June 6, 2014, Det. Oriolo testified before a Grand Jury that both Irby and Gilbert had identified Plaintiffs as the shooters. (*Id.* ¶ 9.) Plaintiffs were subsequently indicted by the Grand Jury. (*Id.* ¶ 10.)

Judge James W. Donohue of the Essex County Superior Court presided over both criminal trials, with Assistant Prosecutor Bryan Matthews appearing on behalf of the State of New Jersey, William Fitzsimmons appearing on behalf of Jeffery Richardson, and Dennis S. Cleary appearing on behalf of Colby Richardson. (*Id.* ¶ 11.) The first trial resulted in a mistrial. (*Id.* ¶ 12.) Plaintiffs were retried and acquitted of the charges. (*Id.* ¶ 13.)

## II.   **RELEVANT PROCEDURAL BACKGROUND**

On January 5, 2016, Plaintiffs filed their original complaint in this matter. (ECF No. 1.) On May 31, 2016, Defendants State of New Jersey, Assistant Prosecutor Jamal Semper ("Semper"), and Oriolo filed a motion to dismiss. (ECF No. 10.) On October 5, 2016, the Honorable Kevin McNulty, United States District Judge, District of New Jersey[4] entered an Order staying this action pending the outcome of the state criminal proceedings against Plaintiffs. (ECF No. 22.) Judge

---

[3]Plaintiffs do not dispute that Gilbert stated that she saw Plaintiffs earlier that day; however, they argue that video footage contradicts her statement regarding seeing Plaintiffs earlier. (PSOMF ¶3.)
[4] This matter was reassigned to the undersigned on June 28, 2021. (ECF No. 79.)

McNulty also granted the Defendants' motion to dismiss Plaintiffs' requests for injunctive relief. (*Id.*)

Following the conclusion of Plaintiffs' state criminal proceedings, Plaintiffs motioned for leave to file an amended complaint. (ECF No. 23.) On September 19, 2018, the Court lifted the stay in this matter and granted Plaintiffs leave to file an amended complaint. (ECF No. 25.)

On January 22, 2019, Plaintiffs filed their Amended Complaint against Defendants State of New Jersey, Det. Oriolo, Semper, and Jane and John Does, raising the following claims: (1) Count One alleges a Fourth Amendment false arrest against Det. Oriolo; (2) Count Two alleges a Fourteenth Amendment due process claim against Det. Oriolo; (3) Count Three alleges Fifth and Fourteenth Amendment claims against Semper; (4) Count Four alleges a Fourth Amendment malicious prosecution claim against Det. Oriolo and Semper; (5) Counts Four (in addition to the § 1983 claim), Five, and Seven allege state law claims for malicious prosecution, intentional infliction of emotional distress and defamation against all Defendants; (6) Counts Six (compensatory damages) and Eight (punitive damages) address remedies and not causes of action; and (7) Count Nine alleges a claim for declaratory relief against Semper. (*See* ECF No. 34.)

On April 1, 2019, all Defendants moved for dismissal of the Amended Complaint. (ECF No. 39.) On November 18, 2019, Judge McNulty dismissed all counts against Semper in the Amended Complaint. (ECF Nos. 51 and 52.) Judge McNulty also noted that Counts Six (compensatory damages) and Count Eight (punitive damages) are remedies and not causes of action. (ECF No. 51 at 4 n.3.) Defendants filed an Answer to Plaintiffs' Amended Complaint on December 11, 2019. (ECF No. 55.)

Defendants now move for summary judgment, arguing: (1) Defendants are entitled to summary judgment on Counts One and Four because there was probable cause supporting Plaintiffs' arrest and prosecution; (2) Defendants are entitled to summary judgment on Count Two

because an unduly suggestive identification alone does not create a constitutional violation; (3) Defendants are entitled to summary judgment on state common law torts claims in Counts Four, Five, and Seven because Plaintiffs failed to file a Notice of Tort Claim; (4) Det. Oriolo is entitled to qualified immunity; and (5) Claims against Defendants State of New Jersey and Oriolo in his official capacity are barred. (*See* ECF No. 88-3.)

Accordingly, briefing is complete, and this matter is ripe for determination.

III.   **LEGAL STANDARD**

A court should grant summary judgment if the evidence in the record, viewed with all reasonable inferences in favor of the nonmoving party, demonstrates that there is no genuine issue of material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Brooks v. Kyler*, 204 F.3d 102, 105 n.5 (3d Cir. 2000); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986); *Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir. 1989). An issue is "genuine" only if a reasonable jury could possibly find in the non-movant's favor on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is "material" only if it influences the outcome under the applicable law. *Id.* at 248.

The moving party bears the initial burden of informing the district court of the basis for its motion and demonstrating either (1) that there is no genuine issue of fact and that as a matter of law, the moving party must prevail, or (2) that the nonmoving party has not shown facts relating to an essential element of the issue for which he bears the burden. *Celotex*, 477 U.S. at 323, 331. Once either showing is made, the burden shifts to the nonmoving party, who must demonstrate facts which support each element for which he bears the burden and establish the existence of genuine issues of material fact. *Id.* To satisfy this burden, the non-moving party "may not rest upon the mere allegations or denials of his pleading," Fed. R. Civ. P. 56(e), and he "must do more than simply show that there is some metaphysical doubt as to the material facts." *Big Apple BMW, Inc.*

*v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993). The non-moving party must go beyond the pleadings and point to specific factual evidence showing there is a genuine material issue for trial. *Celotex*, 477 U.S. at 323–24. This is a rigorous burden for the non-movant: he must "point to concrete evidence in the record that supports each and every essential element of his case." *Orsatte v. N.J. State Police*, 71 F. 3d 480, 484 (3d Cir. 1995). Speculation and conjecture will not suffice. *See Jackson v. Danberd*, 594 F.3d 210, 227 (3d. Cir. 2010).

## IV.   <u>ANALYSIS</u>

Defendants argue they are entitled to summary judgment on all remaining claims against Defendants.

### A.  State of New Jersey and Official Capacity

Defendants seek dismissal of Plaintiffs' claims against the State of New Jersey and Det. Oriolo in his official capacity. (ECF No. 88-3 at 49-52.)

From the outset, the State of New Jersey is not a person subject to suit under § 1983. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) (holding that neither a State nor its officials acting in their official capacities are "persons" under § 1983). Therefore, Plaintiffs' claims against the State of New Jersey are dismissed with prejudice for failure to state a claim upon which relief may be granted.

Similarly, Plaintiffs cannot bring their § 1983 claims against Det. Oriolo for monetary damages in his official capacity. Indeed, a state official sued in his official capacity for monetary damages is not a "person" for purposes of §1983. *See House v. Fisher*, No. 14-2133, 2016 WL 538648, at *7 (M.D. Pa. Feb. 11, 2016) (citing *Will*, 491 U.S. at 63-71); *Goode v. New Jersey Dep't of Corr.*, No. 11-6960, 2015 WL 1924409, at *10 (D.N.J. Apr. 28, 2015) (state officials sued in official capacities for monetary damages are not "persons" within meaning of Section 1983.)

Thus, Plaintiffs' § 1983 claims against Det. Oriolo in his official capacity, seeking monetary relief are dismissed with prejudice for failure to state a claim upon which relief may be granted.

### B. Fourth Amendment

Plaintiffs' Amended Complaint raises Fourth Amendment false arrest/malicious prosecution claims. Det. Oriolo argues that he is entitled to summary judgment because he had probable for the arrest and prosecution of Plaintiffs. (ECF No. 88-3 at 16-23.)

These claims implicate Plaintiffs' rights under the Fourth Amendment to the United States Constitution, which provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.

Under the Fourth Amendment, an arrest or prosecution is a constitutional violation that may be redressed under 42 U.S.C. § 1983 only if that prosecution is undertaken without probable cause. *See Walmsley v. Philadelphia*, 872 F.2d 546, 551 (3d Cir. 1989) (citing *Patzig v. O'Neill*, 577 F.2d 841, 848 (3d Cir. 1978)). "To state a [§ 1983] claim for false arrest or improper seizure under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause." *Brown v. Mount Laurel Twp.*, No. CV 13-6455, 2016 WL 5334657, at *6 (D.N.J. Sept. 21, 2016) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995).

To state a § 1983 claim for malicious prosecution, a plaintiff must establish that "(1) the defendant [i.e., the defendant in the civil § 1983 action] initiated a criminal proceeding; (2) the criminal proceeding ended in [the plaintiff's] favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing

the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Halsey v. Pfeiffer*, 750 F.3d 273, 296-97 (3d Cir. 2014) (citing *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007)).

The central issue in determining liability in a § 1983 action based on a claim of false arrest is "whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988). "Probable cause to arrest exists where the arresting officer has knowledge of facts and circumstances sufficient to permit a prudent person of reasonable caution to believe that the person arrested has committed an offense." *Young v. City of Hackensack*, No. 04-2011, 2005 WL 1924327, at *3 (D.N.J. Aug. 11, 2005), aff'd, 178 F. App'x 169 (3d Cir. 2006). In conducting an inquiry into whether probable cause to arrest existed, a court should consider the totality of the circumstances presented, and "must assess the knowledge and information which the officers possessed at the time of arrest, coupled with the factual occurrences immediately precipitating the arrest." *United States v. Stubbs*, 281 F.3d 109, 122 (3d Cir. 2002).

A facially valid warrant establishes probable cause for an arrest and indicates that the arrest was objectively reasonable. *See Young*, 178 F. App'x at 171–72 (affirming grant of summary judgment to defendants in false arrest § 1983 case on basis of probable cause and qualified immunity where warrant "appears on its face to be valid"); *see also Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) ("Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'") (quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984)); *McRae v. City of Nutley*, No. 12–6011, 2015 WL 6524629, at *8 (D.N.J. Oct. 28, 2015). An arrest warrant, however, "does not, in itself, shelter an officer from liability for false arrest." *Wilson v.*

*Russo*, 212 F.3d 781, 786 (3d Cir.2000). Instead, a plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence that: (1) the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) such statements or omissions are material, or necessary, to the finding of probable cause. *Id.* at 786–87.

In conducting the probable cause analysis, "the district court must identify any improperly asserted or omitted facts and, if it determines there were reckless misrepresentations or omissions, 'excise the offending inaccuracies and insert the facts recklessly omitted' from the affidavit and assess whether the reconstructed affidavit would establish probable cause." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 470 (3d Cir. 2016) (quoting *Wilson*, 212 F.3d at 789). Thus, where the original affidavit contains reckless misrepresentations or omissions, the court "perform[s] a word-by-word reconstruction of the affidavit." *Dempsey*, 834 F.3d at 470. Likewise, "where additional information in the record bears on the materiality of the recklessly omitted information to probable cause, that additional information also should be included [in] the reconstructed affidavit." *Id.* at 475. If the reconstructed affidavit would still establish probable cause, "the plaintiff's claim fails because 'even if there had not been omissions and misrepresentations' in the affidavit presented to the magistrate judge, there would have been probable cause for the charges against the plaintiff." *Id.* at 470 (quoting *Wilson*, 212 F.3d at 789).

Defendants argue that they are entitled to summary judgment because Det. Oriolo had probable cause supporting Plaintiffs' arrest and prosecution. (*See* ECF No. 88-3 at 16-23.) Defendants argue that there was probable cause based on eyewitness statements. Defendants support this argument by noting that the Superior Court Judge found probable cause for Plaintiffs' arrest based on the Det. Oriolo's Affidavit and the Grand Jury found sufficient probable cause to indict Plaintiffs. (*Id.*)

Plaintiffs submit multiple alleged omissions from the Affidavit, which Plaintiffs argue amount to lack of probable cause. (*See* ECF No. 91 at 1-2.)

Although the Affidavit contained certain omissions, which the Court addresses below, the Court's reconstructed Affidavit nevertheless provides probable cause for the arrest and prosecution of Plaintiffs. Therefore, because no Fourth Amendment violation occurred, Det. Oriolo is entitled to summary judgment on the false arrest/malicious prosecution claims.

### 1. Reckless Omissions

First the Court assesses the evidence that Plaintiffs allege was recklessly omitted from the Affidavit. "[O]missions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know. . .." *Wilson*, 212 F.3d at 783. The court only considers omitted information that is "relevant" to the existence of probable cause. *Dempsey*, 834 F.3d at 471. The relevancy inquiry ensures than an officer does not make "unilateral decisions about the materiality of information," while recognizing that for practical reasons, courts "cannot demand that police officers relate the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a novelist or gossip. . .." *Wilson*, 212 F.3d at 787; *see also Dempsey*, 834 F.3d at 471. "Indeed, in many cases it is not only appropriate but desirable for officers to provide the magistrate with a distilled version of the circumstances giving rise to probable cause." *Dempsey*, 834 F.3d at 471 n.10.

A court does not engage in the "deliberately slanted perspective" of summary judgment when compiling the facts into a reconstructed affidavit. *Dempsey*, 834 F.3d at 471 (quoting *Reedy v. Evanson*, 615 F.3d 197, 214 n.24 (3d Cir. 2010)). Likewise, a court does not accept the plaintiff's representations of the record at face value and instead conducts its analysis "based on the evidence

reflected in the record itself." *Dempsey*, 834 F.3d at 471 n.11. "[T]he probable cause standard by definition allows for the existence of conflicting, even irreconcilable, evidence." *Id.* at 468.

There is a presumption that information provided by a victim or witness to a crime carries an indicia of reliability. *Greene v. City of Philadelphia*, No. 97-4264, 1998 WL 254062, at *7 (E.D. Pa. May 8, 1998); *see also Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997) (citation omitted) (noting that when police receive reliable identification by a victim of an attacker there is probable cause to arrest) abrogated on other grounds by *Curley v. Klem*, 499 F.3d 199, 209–11 (3d Cir. 2007); *Grimm v. Churchill*, 932 F.2d 674, 675 (7th Cir. 1991) ("When an officer has received his information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth, he has probable cause.") (internal quotes omitted). "The skepticism and careful scrutiny usually found in cases involving informants . . . is appropriately relaxed if the informant is an identified victim." *Sharrar*, 128 F.3d at 818 (quoting *Easton v. City of Boulder*, 776 F.2d 1441, 1449 (10th Cir. 1985)).

Here, Plaintiffs argue that the eyewitness and victim identifications were unreliable. Plaintiffs put forth a list of facts that they allege were omitted from the Affidavit,[5] which the Court will address in turn.

Plaintiffs first claim that the two eyewitness statements incorrectly assert that each victim was shot by both shooters, where the evidence shows that one shooter shot one victim, while the second shooter shot the second victim. Plaintiffs support this allegation by claiming that Irby told

---

[5] Plaintiffs' response to Defendants' Motion for Summary Judgment gives a brief summary of which inconsistencies Plaintiffs believe Det. Oriolo omitted from the Affidavit for the search warrant. (*See* ECF No. 91 at 1-2.) Plaintiffs' motion for summary judgment, however, gives a more in-depth description of these alleged inconsistencies. (*See* ECF No. 89-1 at 8-12.) In light of Plaintiffs' *pro se* status, the Court will consider the more in-depth arguments made regarding these alleged inconsistencies from Plaintiffs' motion for summary judgment.

Det. Oriolo that "D & B shot [Williams],"[6] and Gilbert told Det. Oriolo that "J & B shot [her]."[7] (*See* ECF No. 89-1 at 8-9.) Plaintiffs claim Det. Oriolo omitted this inconsistency from his Affidavit of probable cause.

The Court agrees that the evidence discussed above shows that each victim was shot by a separate shooter. (*See* ECF No. 89-9, December 30, 2013 Continuation Report at 7.) These inconsistencies, however, are not relevant to probable cause. Plaintiffs claim Irby stated that "D & B shot Naeem [Williams]" and Gilbert stated that "J & B shot [her]". (*See* ECF No. 89-2 at 4-5.) The portions of. Irby's statement provided to the Court do not contain the quotation "D & B shot Naeem [Williams]." (*See* ECF No. 89-7.) Further, Plaintiffs only provide the Court with certain pages from Irby's statement. While two of the pages contain statements regarding which Plaintiff appeared in each photograph and statements regarding the shooting of Williams, it is unclear to the Court if Irby did in fact state that both Plaintiffs shot Williams. (ECF No. 89-7 at 9 and 10.)

Regarding Gilbert's statement, she believed that she was struck by bullets from both "J and B." The fact that Gilbert was only struck by bullets from one gun, does not render her belief that she was struck by bullets from the guns of both individuals firing in her direction inconsistent with the evidence. These alleged inconsistencies are trivial. *Wilson*, 212 F.3d at 791 (stating that courts have "concluded that discrepancies in the victim's description were 'trivial, given their nature' and in light of [a] positive identification. . ..") (quoting *Lallemand v. University of R.I.*, 9 F.3d 214,

---

[6] Plaintiff do not dispute that Ms. Irby identified photographs of Plaintiffs as the individuals she knew as "D" and "B." After viewing a photo array, Ms. Irby identified the individual she knew as "D" to be Plaintiff Colby Richardson and the individual she knew as "B" to be Plaintiff Jeffery Richardson (*See* ECF No. 89-10, February 19, 2014 Continuation Report at 9.)

[7] The transcript of Det. Oriolo's interview of Ms. Gilbert indicates that Ms. Gilbert identified a picture of Plaintiff Colby Richardson as the individual she knew as "B" and she identified a picture of Plaintiff Jeffery Richardson as the individual she knew as "J." (*See* ECF No. 89-8 at 12:19 to 14:19.) Plaintiffs do not dispute that the pictures that Ms. Gilbert identified as photographs of "B" and "J" were photographs of Plaintiffs.

217 (1st Cir. 1993)). The Court does not find that the inconsistencies were relevant to probable cause. *Dempsey*, 834 F.3d at 471.

Next, Plaintiffs claim Irby's statement to detectives that the shooters ran "toward Sherman Avenue by the two churches" after the shooting was inconsistent with the evidence and Det. Oriolo should have included this inconsistency in his Affidavit. (ECF No. 89-2 at 4.)

Plaintiff is correct that Irby did tell detectives that "[t]hey ran towards Sherman . . . from Clinton Avenue towards Sherman Avenue . . . like around that bend by the two churches." (ECF No. 89-7 at 13:3-15.) Plaintiff is also correct that the evidence in Det. Oriolo's possession at the time he was seeking the arrest warrants was inconsistent with this statement. 911 caller Carolyn Warren informed officers that she saw "two individuals running southbound on Elizabeth Avenue towards Miller Street." (ECF No. 89-9, December 30, 2014 Continuation Report at 5.) 911 caller Chanel Bently also informed detectives that she witnessed the shooting from her vehicle, and she saw two individuals turn and run "southbound on Elizabeth Avenue." (*Id.* at 8.) Det. Oriolo also testified that video footage captured the two individuals run away on Elizabeth Avenue. (ECF No. 89-14 at 55:3.) This is an inconsistency between an eyewitness statement and the evidence available to Det. Oriolo. Therefore, the Court will include this omission in the reconstructed affidavit of probable cause below.

Next, Plaintiffs argue that Det. Oriolo omitted an additional portion of Irby's statement, which they allege shows that she did not witness the shooting. (*See* ECF No. 89-2 at 5-6.) Plaintiffs point to the following portion of Irby's statement:

> Detective Nicholas [Oriolo]: Okay, take me back to the shooting. You said you heard it and looked over there?
>
> Ms. Irby: Mm-hm.
>
> Detective Nicholas [Oriolo]: What did you see?

Ms. Irby: It was a lot of people over there but how I knew it was Nut cuz they didn't have him covered up. He was just, like, it was like his head was on the ground, he was right by the fire hydrant.

(ECF No. 89-7 at 11:8-15.) Plaintiffs submit that surveillance did not show a lot of people present when the shooting took place and that this statement from Irby shows that she did not witness the shooting, rather she only saw the aftermath. (*See* ECF No. 89-2 at 5-6.)

The Court agrees that this portion of Irby's statement is clearly discussing what she saw after the shooting, however, Plaintiffs have again only provided portions of her statement and have chosen to omit several pages of questioning that took place prior to this statement. (*See* ECF No. 98-2.) Assuming arguendo that those missing pages are irrelevant to this issue, the pages that have been provided clearly show that Irby informed detectives that she witnessed the actual shooting. When asked who she saw shoot the victim, she indicated "D, with the dreads. . . Yeah, it's D. I don't know they real name. We call him D and B." (*Id.* at 11:19-24.) Irby was asked if she saw both brothers out there and responded "Mm-hm. They both ran." (*Id.* at 13:1-3.) That an individual who witnessed the shooting also witnessed the aftermath of said shooting is not a fact that the Court finds Det. Oriolo should have known "was the kind of thing the judge would wish to know" in making a probable cause determination. *Wilson*, 212 F.3d at 785-87.  Officers are not required to present every bit of information to the judge who issues an arrest warrant. *Id.* at 787 ("We cannot demand that police officers relate the entire history of events.") The Court does not find that this was an omission relevant to probable cause.

Next, Plaintiffs argue that the evidence contradicts Gilbert's statement that she saw and interacted with Plaintiffs shortly before the shooting. (*See* ECF No. 89-2 at 5-6.) Plaintiffs claim that video footage from outside of Luisa Grocery,[8] located at 123 Elizabeth Avenue, Newark, New

---

[8] Luisa Grocery is also referred to as "Luysa Deli" and "Louise Deli" throughout the evidence.

Jersey, where Gilbert stated she saw Plaintiffs prior to the shooting, does not show Gilbert during the relevant time. (*Id.*) Plaintiffs argue that Gilbert's identification of Plaintiffs was based on her earlier sighting of Plaintiffs. (*Id.*) Thus, they argue that because the video footage from the sidewalk in front of Luisa Grocery does not show Gilbert, her identification of Plaintiffs was based upon a sighting that never occurred. (*Id.*)

The evidence shows that Gilbert did state that she saw Plaintiffs before the shooting. However, Gilbert did not state that she saw Plaintiffs immediately in front of Luisa Grocery, as Plaintiffs argue. Rather, she stated that she saw Plaintiffs across the street from the Chicken Shack. Gilbert provided the following in her statement:

> Detective Nicholas [Oriolo]: Okay. When you were walking down Elizabeth Avenue, at any time, did you pass the area of 123 Elizabeth Avenue, the area of Louise's (phonetic) Deli and the chicken restaurant there?
>
> Ms. Gilbert: Yes.
>
> Detective Nicholas [Oriolo]: Okay. When you were doing this, did you see anybody you know?
>
> Ms. Gilbert: Yeah.
>
> Detective Nicholas [Oriolo]: Okay. Who - - who—
>
> Ms. Gilbert: Well, yes.
>
> Detective Nicholas [Oriolo]: Who did you see?
>
> Ms. Gilbert: I saw a couple - - a couple of Richardsons, I saw some brothers - -
>
> Detective Nicholas [Oriolo]: Okay.
>
> Ms. Gilbert: I saw some other little homies.
>
> Detective Nicholas [Oriolo]: Yeah, okay. Did you talk to anybody when you were walking through?
>
> Ms. Gilbert: Yes.
>
> Detective Nicholas [Oriolo]: Okay. Who did you talk to?
>
> Ms. Gilbert: I spoke with 2 boys that is brothers.

Detective Nicholas [Oriolo]: Okay. Did they have any names - - do you know their names, or street names?

Ms. Gilbert: I know they street name.

Detective Nicholas [Oriolo]: Okay, what's - - what names to they go by on the street?

Ms. Gilbert: J and B.

Detective Nicholas [Oriolo]: Okay. So, you saw J and B. Did you talk with them at all?

Ms. Gilbert: Yes, I spoke to B.

Detective Nicholas [Oriolo]: Okay. What was your conversation?

Ms. Gilbert [Oriolo]: He just asked me for a cigarette.

Detective Nicholas: Okay. When - - when he had this conversation with you, were you in front of the Chicken Shack and the Deli, or were you on, like, somewhere else?

Ms. Gilbert [Oriolo]: I was across the street.

Detective Nicholas [Oriolo]: Okay, so you were on the other side of the road from the Chicken Shack?

Ms. Gilbert: Yes.

(ECF No. 89-8 at 4:5 to 5:22.)

According to the evidence, the Chicken Shack and Luisa Grocery are located next to each other. (*See* ECF No. 89-14: 115:25 to 116:4.) Luisa Grocery had two exterior cameras which captured footage "northbound to view the sidewalk in front of the business and Elizabeth Avenue at the intersection with Alpine Street" and "southbound to view the sidewalk in front of the business and Elizabeth Avenue south of the intersection with Alpine Street." (ECF No. 89-10 at 6.) Det. Oriolo testified that there was no direct camera facing the other side of the street from Luisa Grocery. (ECF No. 89-14 at 124:20-24.) He also testified that Plaintiffs were seen in the video footage from the sidewalk out front of Luisa Grocery and they went in and out of frame throughout the course of the video. (*Id.* at 122:2-3, 124:11-13, and 124:4-8.)

17

Plaintiffs submit that the fact the parties stipulated at trial that the angle of the cameras outside of Luisa Grocery did not show Gilbert meet with Plaintiffs, shows that Gilbert's statement that she saw Plaintiffs before the shooting was false. (*See* ECF No. 91 at 1-2; *see also* 89-2 at 5.) The evidence shows that the parties did stipulate that the video footage from Luisa Grocery did not show Gilbert meet with Plaintiffs. (ECF No. 89-13, N.T. June 13, 2018 at 148:24 to 149:8.) However, the stipulation was only regarding the video footage from the sidewalk in front of Luisa Grocery and the Chicken Shack, and, as explained above, Gilbert told detectives that she interacted with Plaintiffs across the street from the Chicken Shack. The evidence before the Court is not inconsistent with Gilbert's statement and the Court does not find that Det. Oriolo recklessly omitted from his Affidavit the fact that there is no footage of the area in which Gilbert stated this interaction took place.

More importantly, Plaintiffs allege that Gilbert's identification of Plaintiffs was based on this earlier encounter with them. However, the record does not support that allegation. Gilbert clearly stated that she already knew Plaintiffs for some time. Gilbert stated that she knew Colby Richardson for two to three years and he used to "give [her] money and buy [her] stuff." (ECF No. 89-8 at 6:6-16.) Gilbert did not indicate that her identification of Plaintiffs was based on her seeing them earlier that evening, rather, Gilbert knew Plaintiffs prior to the day of the shooting.

Next, Plaintiffs argue that Det. Oriolo omitted from the Affidavit that Gilbert used PCP.[9] (*See* ECF No. 89-2 at 11.) Plaintiffs state that Gilbert's sister, Jaqueline Padin ("Padin') told Det. Oriolo that "she, Naeem [Williams], and Jennifer [Gilbert] used to smoke PCP together". (*Id.*)

---

[9] Plaintiffs do not raise the issue of Gilbert's PCP use in response to Defendants' motion for summary judgment. However, Plaintiffs raise the issue in their own motion for summary judgment. (*See* ECF No. 89-1 at 7.) Given Plaintiffs *pro se* status and the fact that this argument goes to their overall responsive argument that Det. Oriolo lacked probable cause for Plaintiffs' arrest and prosecution, the Court discusses the issue here.

This information leads Plaintiffs to argue that Det. Oriolo knew or should have known Gilbert was on PCP the day of the shooting.

The evidence does not support Plaintiffs' contention. It is correct that at trial Det. Oriolo admitted that in a December 16, 2013 statement, Padin informed detectives that she, Gilbert and "Na" used to smoke PCP together. (ECF No. 89-15 at 39:18 to 40:5.) That does not establish, however, that Det. Oriolo knew or should have known whether Gilbert smoked PCP the night of the shooting. Det. Oriolo also testified that Gilbert did not indicate to him that she smoked PCP. (*Id.* at 91:14-17.) Plaintiffs have not provided evidence to show that Det. Oriolo knew Gilbert was or may have been on PCP at the time of the shooting and recklessly omitted that information from the Affidavit. *United States v. Stubbs*, 281 F.3d 109, 122 (3d Cir. 2002) (finding the Court "must assess the knowledge and information which the officers possessed at the time of arrest, coupled with the factual occurrences immediately precipitating the arrest.")

Plaintiffs' next and final argument is that probable cause was lacking because Gilbert only identified Plaintiffs after Det. Oriolo told her that they were involved in the shooting. (*See* ECF No. 89-1 at 5-7.) Plaintiffs argue that Gilbert testified that Det. Oriolo met with her several times prior to her recorded statement and told her Plaintiffs were involved. (*Id.*)

On February 3, 2015, Gilbert provided Det. Oriolo with a statement regarding the shooting. (*See* ECF No. 89-8.) As explained above, during the interview Gibson stated that she saw individuals that she knew as B and J shortly before the shooting and that she had known them for several years. (*Id.* at 5:1 to 6:18.) When Det. Oriolo asked Gilbert if she recognized who was shooting at her, she responded "I saw one of the boys with the hoodie who I spoke to earlier in the day." (ECF No. 89-8 at 9:21-25.) When asked who it was, Gilbert stated it was B and he was wearing a hoodie that was either blue or blue/gray with stripes on it. (*Id.* at 10:1-14.) Gilbert also

stated that she saw a second individual with "dreads." (*Id.* at 10:18-21.) Det. Oriolo asked Gilbert

if she knew the individuals and she provided the following answers:

> Ms. Gilbert: The boy - - the one I spoke to earlier in the day.
>
> Detective Nicholas [Oriolo]: It was the boys that you spoke to earlier in the day?
>
> Ms. Gilbert: Yeah.
>
> Detective Nicholas [Oriolo]: Okay. And, you identified them as B and J?
>
> Ms. Gilbert: Yes.
>
> Detective Nicholas [Oriolo]: Okay. If I showed you a picture, you think you would be able to identify them?
>
> Ms. Gilbert: Yes.
>
> Detective Nicholas [Oriolo]: Okay. Let me show you a picture first.
>
> Detective Anthony [Oriolo]: How long do you know B for? How many years?
>
> Ms. Gilbert: I'm gonna - - I can say about 2, 3.
>
> Detective Anthony [Oriolo]: So, more than a year?
>
> Ms. Gilbert: Yeah, more than a year.
>
> Detective Anthony [Oriolo]: Do you know the other individual you described as D?
>
> Detective Nicholas [Oriolo]: B.
>
> Detective Anthony [Oriolo]: B, I'm sorry. J and B. The other individual B. How long do you know him for?
>
> Ms. Gilbert: Like I said - - they came on about the same time.
>
> Detective Anthony [Oriolo]: So, more than a year?
>
> Ms. Gilbert: Yeah.

(*Id.* at 10:24 to 12:1.) Gilbert was then shown a photograph of each Plaintiff and she identified

them as the men who shot her and Williams. (*Id.* at 12:19 to 14:19.)

During Plaintiffs' first trial Gilbert testified that Det. Oriolo met with her on three or four occasions prior to the February 3, 2014 recorded statement. (ECF No. 89-12, N.T. 10/24/2017 at 188:1-9.) Gilbert's testimony regarding these meeting is inconsistent. Gilbert testified that they would have conversations about the incident (*Id.* at 92:16-18) but then she testified that prior to her recorded statement she was unable to speak. (*Id.* at 93:15-20.) Gilbert also testified that prior to February 3, 2014, Det. Oriolo showed her three pictures of other individuals who were not the individuals who shot at her. (*Id.* at 177:16-25, 193:23 to 194:5.) Gilbert's testimony regarding whether Det. Oriolo mentioned Plaintiffs to her prior to her recorded statement is confusing and contradictory. She testified that prior to identifying Plaintiffs on February 3, 2014, Det. Oriolo never mentioned Plaintiffs to her. (*Id.* at 89:7-25.) However, she also testified that prior to February 3, 2014, Det. Oriolo indicated to her that J and B were suspects. (*Id.* at 94:12-17.)

Gilbert did testify that she identified Plaintiffs based on what she observed that night and not what detectives told her. (*Id.* at 121:3-8.) During Plaintiffs' trial, Gilbert testified that she recognized the men that shot at her. Gilbert testified as follows:

Q.  And when you saw the area where the bullets were coming from did you recognize the people that were firing the weapons at you?

A.  Yes.

Q.  And who were they?

A.  J and B.

Q.  Okay. Is - - is that the way you knew them as J and B?

A.  Yes.

Q.  And when you saw them did you recognize them because of the fact that you had known them for a long period of time?

A.  Yes.

(*Id.* at 147:4-16.)

21

At trial Det. Oriolo was asked about the statement he took from Gilbert. Det. Oriolo testified that between the December shooting and the time Gilbert gave her statement on February 3, 2014, he visited the hospital "frequently" to "check on her status" and see if she was out of a coma and able to speak. (*See* ECF No. 89-14, N.T. 6/14/2016 at 76:13 to 77:9.) He testified that Gilbert was intubated and in a coma until February 3, 2014. (*Id.* at 79:7-19.) Det. Oriolo testified that on February 3, 2014, he conducted a pre-interview with Gilbert prior to taking her statement to ensure she was conscious and coherent. (*Id.* at 78:3-9.) Regarding when he showed Gilbert photographs of Plaintiffs, Det. Oriolo testified as follows:

> Q. The time frame in you showing the two photos during the interview of Jennifer Gilbert, was it before or after she told you who shot her?
>
> A. So it was after she recalled what happened that evening and told us who shot her.
>
> Q. And, thereafter, your decision was to show a picture of Colby Richardson and Jeffery Richardson?
>
> A. Yes, ma'am.
>
> Q. Did you tell Jennifer Gilbert before the interview who shot her?
>
> A. No.

(*Id.* at 86:2-12.)

There is conflicting information within the record as to whether Det. Oriolo spoke with Gilbert prior to her providing her statement. There is also conflicting information regarding whether Det. Oriolo told Gilbert that they suspected Plaintiffs were involved in the shooting prior to her statement. However, Gilbert was clear in her testimony that she saw who shot at her and she identified Plaintiffs as those individuals. Gilbert was also clear that she knew Plaintiffs for several years. Viewing the evidence in the light most favorable to the nonmoving party, the Court will

include that Gilbert was informed that Plaintiffs were suspected in the shooting prior to giving her statement in the reconstructed affidavit.

### 2. *Materiality*

The Court must now determine if the omitted information from the Affidavit was material to a finding of probable cause. *Wilson*, 212 F.3d at 789.

In making the materiality determination, a court must perform "reconstructive surgery" on the original affidavit by first "excis[ing] offending inaccuracies and insert[ing] the facts recklessly omitted, and then determin[ing] whether or not the 'corrected' warrant affidavit would establish probable cause." *Id.* "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Id.* In making that assessment, both exculpatory and inculpatory evidence must be considered. *Id.* at 790. The Court must return to the ordinary summary judgment standard and consider the reconstructed affidavit as "simply . . . one more set of factual assertions that must then be viewed in the light most favorable to the non-movant." *Reedy*, 615 F.3d at 214 n. 24.

Here, the reconstructed affidavit results in the following (with the inserted facts being in bold):

2. The facts establishing probable cause and upon which I rely in support of this Application are as follows:

On December 15, 2013 at approximately 1937 hours, Newark police were dispatched to the area of 1 Elizabeth Avenue, Newark in response to a shooting. Upon arrival, they observed two victims, later identified as Naeem Williams and Jennifer Gilbert, suffering from gunshot wounds. EMS responded. Naeem Williams was pronounced dead at the scene by Dr. Natal. The surviving victim, Jennifer Gilbert, was transported to UMDNJ where she underwent surgery for multiple gunshot wounds.

On December 16, 2013, Medical Examiner, Dr. Abraham Philip conducted an autopsy on Naeem Williams. Dr. Philip found the cause of death to be multiple gunshot wounds and the manner of death as homicide.

3. The Essex County Prosecutor's Office Homicide Task Force and Crime Scene Unit also responded to the scene. An Exxon employee indicated that he heard several shots and possibly saw two shooters and immediately fled into the gas station. Ten (10) .40 caliber casings, four (4) .45 caliber casings, one (1) projectile, and two (2) fragments were retrieved from the scene.

4. The victim's girlfriend, Christina Green, stated that Williams was on the phone with her at the time of the incident at which time the phone went dead.

5. Another witness, who heard shots fired and saw two suspects fleeing on foot, called 911. When the witness heard the victim's phone ring, she answered it and it was Christina Green. The witness directed Ms. Green to come to the location because the victim had been shot. The witness left the phone next to the victim's body.

6. "W1" was in the area of Elizabeth Avenue and Clinton Avenue on the day of the shooting. W1 observed the victim, Naeem Williams, who W1 knows as "Nut" along with Jennifer Gilbert, who W1 knew as "Red" near the Exxon Gas Station located at the intersection of Elizabeth Avenue and Clinton Avenue. W1 saw two suspects, not wearing masks, walk up to Nut and Red and then began running towards Nut and Red. Both suspects had handguns and were firing at Nut and Red. W1 then saw Nut and Red on the ground and the two suspects running away from the area. **(W1 stated she saw the suspects run from Clinton Avenue towards Sherman Avenue. Video footage showed, and other witnesses stated, that the suspect ran away southbound on Elizabeth Avenue towards Miller Street.)** On January 30, 2014, two separate six photograph displays were shown to W1. In the first array, W1 selected photograph number four of COLBY RICHARDSON, (DOB: 9/16/89), SBI: 540389D as one the individuals who "shot the male Nut". In the second array, W2 selected photograph number four of JEFFREY RICHARDSON (DOB: 9/4/84), SBI: 853850C as on the individuals who "shot a guy named Nut.".

7. On February 3, 2014, Jennifer Gilbert was interviewed at the University Hospital. **(Prior to the interview, Ms. Gilbert had been informed by detectives that the Richardson brothers were suspects in the matter.)** Ms. Gilbert indicated that on the day of the shooting she met Naeem Williams at the Exxon Gas Station located near the intersection of Elizabeth Avenue and Clinton Avenue. Ms. Gilbert heard gunshots, that she initially thought was a firecracker. Ms. Gilbert felt a gunshot hit her leg and she started running. She heard additional gunshots and turned around and saw Naeem Williams fall to the ground. Gilbert sustained gunshot wounds to her leg, back, chest and side of her stomach. Ms. Gilbert identified the shooters as two individuals that she knows as "B" and "J". "B" was subsequently identified as COLBY RICHARDSON, (DOB: 9/16/89), SBI: 540389D and "J" was subsequently identified as JEFFREY RICHARDSON (DOB: 9/4/84), SBI:

853850C. Ms. Gilbert has known "B" and "J" for two to three years. Ms. Gilbert was shown a single photograph of COLBY RICHARDSON and JEFFREY RICHARDSON and identified them as the individuals that shot at her and Naeem Williams.

(ECF No. 88-7 at 4-5.)

Viewing these facts in the light most favorable to Plaintiffs, this Court concludes that the reconstructed Affidavit provides sufficient probable cause for the arrest of Plaintiffs. As explained above, "[p]robable cause exists if there is a 'fair probability' that the person committed the crime at issue." *Wilson*, 212 F.3d at 789. "[T]he evidentiary standard for probable cause is significantly lower than the standard which is required for conviction" and "does not depend on whether the suspect actually committed any crime." *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005). "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Hill v. California*, 401 U.S. 797, 804 (1971). The fact that Irby, stated that she saw Plaintiffs run down the wrong street and the fact that Gilbert may have been informed Plaintiffs were suspects prior to her identification does not undermine a finding of probable cause. Viewing the reconstructed Affidavit as a whole, there were two witnesses to the shooting, Irby, who observed the shooting, and Gilbert, one of the shooting victims. Irby selected Plaintiffs' photographs from two photo arrays conducted by a "blind detective." Gilbert identified the shooters as two individuals, "B" and "J," who were subsequently identified as the Plaintiffs. Gilbert also stated that she had known Plaintiffs for two to three years prior to the shooting and identified them in photographs. Although the insertion of the information that Gilbert may have been informed that Plaintiffs were suspects prior to her identification of them does weaken her identification, she still explicitly stated that she knew Plaintiffs for several years prior to the shooting and witnessed them shoot her and Williams on the night of the incident. More importantly, even without Gilbert's identification, there was an independent eyewitness, Irby, who

also identified Plaintiffs as the shooters. Overall, the reconstructed Affidavit does not vitiate the probable cause finding. Even viewed in the light most favorable to Plaintiff, "no genuine issue of material fact exists as to whether the corrected affidavit supports a finding of probable cause." *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir.1997). The Court will therefore grant Defendants' motion for summary judgment as to Plaintiffs § 1983 false arrest and malicious prosecution claims.[10] [11]

### C. Due Process

Plaintiffs' Amended Complaint raises a Fourteenth Amendment due process claim, alleging that Det. Oriolo violated Plaintiffs' due process rights when he performed a show-up photo identification procedure with Gilbert with only photographs of Plaintiffs. (*See* ECF No. 34 at 5-6.) Plaintiffs claim their due process rights were violated when Det. Oriolo spoke with Gilbert prior to taking her recorded statement and conducted the photo identification. (*Id.*) Defendants argue they are entitled to summary judgment on this claim because an unduly suggestive photo identification does not form a basis for a due process claim. (*See* ECF No. 88-3 at 23-29.)

A defendant has a due process right to a fair trial. That due process right can be violated when evidence resulting from an unduly suggestive identification procedure is introduced at trial;

---

[10] As explained above, probable cause is also necessary to state a § 1983 claim for malicious prosecution. The defendant must have "initiated the proceeding without probable cause." *Halsey*, 50 F.3d at 296-97. For the reasons stated above, the undisputed facts show that probable cause existed, as reflected in the reconstructed affidavit, to prosecute Plaintiffs.

[11] Plaintiffs do not explicitly raise false imprisonment in Count One of their Amended Complaint however, the Court notes that any such claim would also be dismissed. A false imprisonment claim under § 1983 is based on the Fourteenth Amendment protection against deprivation of liberty without due process. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995) (citing *Baker v. McCollan*, 443 U.S. 137, 142 (1979)). Relevant here, an arrest based on probable cause cannot become the source of a claim for false imprisonment. *Id.*; *see also Rosembert v. Borough of East Lansdowne*, 14 F. Supp 3d 631 (W.D. Pa. 2014) (finding that a plaintiff's claim for false imprisonment and false arrest failed where probable cause existed for the arrest).

however, the existence of an unduly suggestive procedure itself does not violate any constitutional rights and cannot alone form the basis of a § 1983 claim. *See Wray v. City of N.Y.*, 490 F.3d 189, 193 (2d Cir. 2007) (citing *Manson v. Brathwaite*, 432 U.S. 98, 113 n. 13 (1977)); *Hensley v. Carey*, 818 F.2d 646, 650 (7th Cir. 1987) ("defendants could not have violated [the § 1983 plaintiff's] constitutional rights simply by subjecting him to a lineup which was allegedly unduly suggestive."); *see also Anderson v. Venango County*, 458 F. App'x 161, 165 (3d Cir. 2012) (citing *Hensley* and holding that "government's violation of 'a prophylactic rule' designed to protect the right to fair trial, without violation of the right to a fair trial itself, does not support a claim under § 1983."). As such, Plaintiffs must show, based on the totality of the circumstances, that the "pretrial identification procedure was so unnecessarily suggestive as to give rise to a substantial likelihood of irreparable misidentification that admitting the identification testimony would be a denial of due process." *United States v. Clausen*, 328 F.3d 708, 713 (3d Cir. 2003).

Therefore, an identification procedure, including showing a witness a photo or a photo array, violates due process if it "is both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification . . .." *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006) (citing *Manson*, 432 U.S. at 107). A "suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability," for reliability is the "linchpin in determining the admissibility of identification testimony." *Manson*, 432 U.S. at 106. To determine whether there was a substantial likelihood of misidentification, the court must look at the reliability of the identification in light of the "totality of the circumstances." *Government of Virgin Islands v. Riley*, 973 F.2d 224, 228 (3d Cir.1992). The court should consider factors such as the witness' original opportunity to observe the suspect, the degree of attention during the initial observation, the accuracy of the initial description, the witness degree of certainty when viewing the suspect at the confrontation, and the elapsed time between the crime and the

apprehension/identification. *Neil v. Biggers*, 409 U.S. at 199–200.  Considering the totality of the circumstance, courts have found the concerns raised by single photo identification are cured when the identification is made by someone who knew the suspect before the incident or by witnesses who had a substantial opportunity to observe the suspect. *See e.g.*, *Peterson v. Korobellis*, No. 09-6571, 2010 WL 5464205, at *7–8 (D.N.J. Dec. 28, 2010) (finding photo identification by a former girlfriend when only a single photo was presented was not unduly suggestive); *Green v. City of Paterson*, 971 F. Supp. 891, 904 (D.N.J. 1997) (finding no substantial risk of misidentification when two eyewitnesses identified the alleged assailant by following him in their vehicle and later were shown a single photograph to confirm the identity of the alleged assailant).

The photo identification in this case did not create a substantial likelihood of misidentification. Although Plaintiffs argue that Det. Oriolo allegedly informed Gilbert that Plaintiffs were suspects prior to her identification of them, Gilbert was clear in her statement that she knew Plaintiffs and that they were the individuals she saw shoot at her and Williams on the night of the incident. As noted above, before Det. Oriolo showed Gilbert the photographs of Plaintiffs, she had identified them t by their street names, "J" and "B", and told Det. Oriolo that they were the individuals who shot her and Williams. (*See generally* ECF No. 89-8.) Gilbert also told Det. Oriolo that she had known Plaintiffs for two to three years prior to the shooting. (*Id.*) Gilbert also testified that she identified Plaintiffs based on what she observed that night and not what detectives told her. (ECF No. 89-12 at 121:3-8.)

According to the trial transcript, Gilbert was shown photographs of Plaintiffs after she identified them by their street names as the shooters. Further, when asked "did he [Det. Oriolo] or anyone else suggest to you in any way, shape, or form, that the Richardsons were involved in this homicide prior to the time that you told him that they were?" Gilbert answered "No." (ECF No. 89-12 at 90:18-22.) There is no evidence in the record suggesting that Gilbert's identification was

based on Det. Oriolo telling her that Plaintiffs were suspects. Thus, while a single photograph identification may be suggestive, the record supports that the identification possessed sufficient aspects of reliability. *Manson*, 432 U.S. at 106. The Court will therefore grant Defendants' motion for summary judgment as to Plaintiffs due process claim.

### D.  Conspiracy

Plaintiffs' Amended Complaint raises a conspiracy claim in Count Three. Plaintiffs fail to explicitly indicate which section Plaintiffs are bringing this claim under. Based on the Amended Complaint, the Court will address conspiracy under § 1983 and § 1985(2).

Plaintiffs argue that Semper led Det. Oriolo into false testimony to prosecute Plaintiffs. (ECF No. 34 at 6.) Plaintiffs also argue that Semper knew that the case against Plaintiffs was based on Det. Oriolo arresting them based on Irby's and Gilbert's false statements. (*Id.*) Defendants move for summary judgment of Plaintiffs' conspiracy claim arguing Plaintiffs have failed to provide any evidence to show Det. Oriolo had an agreement in place with any other individual to violate their civil rights. (ECF No. 88-3 at 52-55.) Defendants also argue that Plaintiffs have failed to provide evidence to show any alleged conspiracy was motivated by class-based, discriminatory animus. (*Id.*)

To prevail on a claim for § 1983 conspiracy to violate civil rights, a plaintiff show that "(1) two or more persons conspire to deprive any person of [constitutional rights]; (2) one or more of the conspirators performs . . . any overt act in furtherance of the conspiracy;" (3) the "overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States," and (4) "the conspirators act[ed] under the color of state law." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 294 n.15 (3d Cir. 2018) (quotation marks omitted).

As explained at length above, probable cause existed for Plaintiffs' arrest and prosecution based on the record before the Court. As such, there is no remaining constitutional claim against

Det. Oriolo. Because Plaintiffs have not established that they suffered any constitutional injury, they cannot succeed on a civil rights conspiracy claim. Thus, Defendants are entitled to summary judgment on Plaintiffs' § 1983 conspiracy claim.

To establish a claim under § 1985(2), a plaintiff must allege one of the statute's two bases for recovery: 1) a conspiracy to "deter by force, intimidation or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein . . ."; or 2) a conspiracy with the purpose of "impeding, hindering, or obstructing, or defeating in any manner, the due course of any justice in any State or Territory, with intent to deny any citizen the equal protection of the laws." 42 U.S.C. § 1985(2).

Plaintiffs appear to assert a claim under the second subsection of § 1985(2). Plaintiffs argue that the evidence shows that probable cause never existed, and Det. Oriolo partook "in a conspiracy to defeat the court of justice in the State of New Jersey, with the intentions of depriving [Plaintiffs] equal protection of the law." (ECF No. 91 at 8-9.)

The Court again notes that probable cause existed for the arrest and prosecution of Plaintiffs. Plaintiffs have failed to provide evidence in the record to show that Det. Oriolo knew or should have known that any witness statement was false. As such, there is no evidence that Det. Oriolo conspired with the purpose of "impeding, hindering, or obstructing" the due course of justice. 42 U.S.C. § 1985(2). Therefore, the Court grants Defendants' motion for summary as to Plaintiffs' § 1985 (2) claim.

### E. Remaining State Law Claims

Plaintiffs' raised state law tort claims for malicious prosecution (Count Four), intentional infliction of emotional distress (Count Five), and defamation (Count Seven) against Defendants. Defendants argue that they are entitled to summary judgment on each of Plaintiffs' common law

claims because Plaintiffs failed to comply with the notification requirements of the New Jersey Tort Claims Act.

Under New Jersey law, "[n]o action shall be brought against a public entity or public employee under [the New Jersey Tort Claims Act ("NJTCA")] unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter." N.J.S.A. § 59:8–3. The NJTCA requires plaintiffs to file a notice of tort claim with the public entity being sued within 90 days of the incident and to wait for a response before filing a lawsuit. N.J.S.A. § 59:8–8(a). The notice requirement is "a jurisdictional precondition to filing suit," *Ptaszynski v. Uwaneme*, 853 A.2d 288, 294 (N.J. Super. Ct. App. Div. 2004) (internal quotation marks omitted), and suits that do not comply with the notice provision are "forever barred from recovering against a public entity or public employee." N.J.S.A. § 59:8–8. *See also Guzman v. City of Perth Amboy*, 518 A.2d 758, 760 (N.J. Super. Ct. App. Div. 1986) ("Timely statutory notice is a prerequisite."). A plaintiff may be permitted to file a late notice of tort claim, however, by making a motion to the court that is "supported by affidavits based upon personal knowledge of the affiant showing sufficient reasons constituting extraordinary circumstances for his failure to file" a timely notice of tort claim within a year of the incident. N.J.S.A. § 59:8–9.

N.J.S.A. § 59:8–9 establishes an exception to the requirement that a claimant file a Notice of Claim within 90 days from the date of accrual. Section 59:8–9 "allows a court to extend the notice period up to one year if the public entity or employee would not be 'substantially prejudiced' by the delay and the claimant shows 'extraordinary circumstances for his failure to file notice' within the proper time period." *Rolax v. Whitman*, 53 F. App'x 635, 638 (3d Cir.2002) (citing N.J.S.A. § 59–8:9). "After the one-year limitation has passed, 'the court is without authority to relieve a plaintiff from his failure to have filed a notice of claim, and a consequent action at law

must fail.'" *Pilonero v. Twp. of Old Bridge*, 566 A.2d 546, 548 (N.J. Super. Ct. App. Div. 1989) (quoting *Speer v. Armstrong*, 402 A.2d 963, 965 (N.J. Super. Ct. App. Div. 1979)).

Plaintiffs concede that they failed to file the required notice of tort claim.[12] (*See* ECF No. 91 at 3.) Given that Plaintiffs have failed to file a notice of tort claim within the requisite time period, their state common law tort claims of malicious prosecution (Count Four), intentional infliction of emotional distress (Count Five), and defamation (Count Seven) are dismissed with prejudice. *See* N.J.S.A. §§ 59:8-3, -8.

**F. Declaratory Relief**

Plaintiffs' ninth ground for relief in the Amended Complaint is raised against the Essex County Prosecutors Office, seeking the return of an iPhone that was taken from Plaintiff Jeffery Richardson. (*See* ECF No. 9.) Defendants argue for dismissal of this claim, as it is raised against the Prosecutor's Office.[13] (ECF No. 88-3 at 56.)

Plaintiffs respond that the claim was brought against Semper, but they now claim that the record shows that Det. Oriolo was once in possession of the iPhone. (ECF No. 91 at 9.) Plaintiffs claim that the record shows that the iPhone was subsequently in the possession of the Essex County Prosecutors Office. Plaintiffs admit the Amended Complaint raised this claim against Semper, who is no longer a defendant in this matter. Plaintiffs also admit that Det. Oriolo would not be in possession of the iPhone at issue. As such, the claim for declaratory relief (Count Nine) against Det. Oriolo is dismissed.

---

[12] Plaintiffs note that they also brought their malicious prosecution claim under § 1983. The Court addressed Plaintiffs' § 1983 malicious prosecution claim above.

[13] Semper was dismissed from this action on November 18, 2019. (*See* ECF Nos. 51 and 52.)

V.   **<u>CONCLUSION</u>**

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 88) is **GRANTED**. Counts One (§ 1983 false arrest/false imprisonment), Two (due process), Four (§ 1983 malicious prosecution), and Nine (declaratory relief) of the Amended Complaint against Det. Oriolo are **DISMISSED without prejudice**. All Counts against the State of New Jersey and the Det. Oriolo in his official capacity are **DISMISSED with prejudice**. Counts Four (state common law malicious prosecution), Five (state common law intentional infliction of emotional distress) and Seven (state common law defamation) are **DISMISSED with prejudice**. Additionally, Plaintiffs' motion for summary judgment (ECF No. 89) is **DISMISSED as moot**. An appropriate Order accompanies this Opinion.

**Dated:** **September 12, 2022**

HONORABLE JULIEN XAVIER NEALS
United States District Judge